UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


BIOSOLIDS DISTRIBUTION SERVICES LLC,
a Minnesota Limited Liability Corporation,


       Plaintiff,


vs.                                        CASE NO:

CITY OF FORT MEADE,
a State of Florida Municipality,


       Defendant.
_____/

## VERIFIED COMPLAINT

Plaintiff BIOSOLIDS DISTRIBUTION SERVICES LLC files this Complaint against

Defendant CITY OF FORT MEADE, FLORIDA, and states as follows:

## NATURE OF THE ACTION

1.     Plaintiff seeks injunctive relief in combination with other statutory and common law

claims for damages from this Court.  In a span of 19 business days, the City of Fort Meade moved

from the submittal of a written request for assistance from the State of Florida Department of

Environmental Protection ("DEP") regarding isolated complaints of an odor to an unanimous

City Commission vote to close down Plaintiff's properly permitted and lawfully operating

business.  Despite Plaintiff's immediate, aggressive, and voluntary actions and offers for

additional facility enhancements to address the odor event, as well as compliance assistance

offered by the DEP, the City Commission, without inviting those present on behalf of the

Plaintiff to discuss such actions and offers or inviting representatives of the DEP to describe

what was done to investigate and address the odor report, unjustifiably voted to shut down Plaintiff. The City's abrupt, improper, and unnecessary action has caused immediate and irreparable harm and damages to Plaintiff.

## PARTIES, JURISDICTION, AND VENUE

2.      Plaintiff BIOSOLIDS DISTRIBUTION SERVICES LLC ("BDS") is a Limited Liability Corporation organized under the laws of Minnesota, and is authorized to transact business in the State of Florida. BDS's principal place of business is located at 350 SMC Drive, Somerset, Wisconsin. BDS operates a biosolids recycling business in the City of Fort Meade located at 1491 NW 14 Street ("Facility"), which uninterrupted business operation is the subject of this action.

3.      BDS is a properly permitted domestic wastewater Facility by the DEP. BDS is in full compliance with all applicable state and federal rules and regulations. The Facility is a permitted use by right in the City's Heavy Industry (M-2) land use classification.

4.      Defendant CITY OF FORT MEADE ("City") is a municipality located within Polk County, Florida.

5.      This Court has specific personal jurisdiction over Defendant City.

6.      This Court has subject matter jurisdiction under 28 U.S.C. §1332 because there is complete diversity of citizenship between Plaintiff and Defendant and the matter in controversy exceeds the sum or value of $75,000, excluding interest, attorneys' fees, and costs.

7.      Venue is proper in the Middle District of Florida, Tampa Division, pursuant to 28 U.S.C. §1332 because the location of the business is located within the city limits of Fort Meade in Polk County, Florida, and this judicial district is where a substantial part of the events and omissions giving rise to the claim occurred.

## GENERAL ALLEGATIONS AND FACTS COMMON TO ALL CLAIMS

### (A) Plaintiff's Facility and Operations are Properly Permitted.

8.     BDS has all applicable regulatory permits and is in full compliance with all applicable state and federal regulatory rules and regulations.

9.     The Facility's location has a land use classification of M-2, which is a permitted use by right according to the City's comprehensive plan and as confirmed by the City's letter of July 1, 2011.  (A copy of which is attached as Exhibit "A".)

### (B) BDS Owns and Operates the "Facility Originally Permitted" by City in 2011

1.     The City admits "…the 'agricultural' facility [was] originally permitted in 2011." The City has rejected BDS's efforts to explain the business relationship existing between BDS and Environmental AG Products ("EAP," referenced above as the "agricultural" facility).

2.     BDS's predecessor EAP and BDS entered into a Regional Facility Agreement ("Facility Agreement") in October 2011.  This Facility Agreement acknowledged EAP had a letter agreement (Exhibit "A") with the City to dispose of the EAP's wastewater and EAP had obtained all necessary approvals and permits to operate the Facility in Fort Meade.

3.     The business plan was initially presented to the City Commission at its June 12, 2011 meeting.  The City Manager informed BDS's predecessor EAP that the "…City Commission fully supports the development and recognizes the long term benefits to the region as well as the City of Fort Meade this project will provide" by letter agreement dated July 1, 2011.  (Exhibit "A.").

4.     Also on July 1, 2011, the Domestic Wastewater Program Manager with the DEP received a letter from the City Manager confirming the "City Commission supports the

development of this project and recognizes the long term benefits to the area as well as the City of Fort Meade."

5.     Significantly, in that same letter to DEP, the City Manager also recognized "…commission [sic] has instructed staff to develop an agreement with [EAP] to allow for the incremental disposal of the wastewater produced by this operation into the City's wastewater collection and treatment system."

6.     The benefit to the City under the July 1, 2011 agreement (as reiterated in the City's subsequent January 12, 2012 correspondence to the DEP) was the "material from the [City's] Wastewater Treatment Plant [delivered] to Environmental AG Product's facility in Fort Meade to be processed."

**(1) BDS Predecessor EAP's Permitting**

7.     In reliance on the City's commitment to the Facility's operations, BDS's predecessor EAP submitted the Application for Constructing a Domestic Wastewater Collection/Transmission System to DEP on August 22, 2011. The City's Public Works Director signed the above application on behalf of the City as its authorized representative.

8.     The DEP issued the permit to construct the Facility's system on September 26, 2011.

9.     On October 20, 2011, BDS' predecessor EAP submitted the Request for Approval to Place a Domestic Wastewater Collection/Transmission System Into Operation. The City Manager signed this request as the City's authorized representative.

10.     On November 9, 2011, the DEP issued to BDS's predecessor EAP the Wastewater Disposal Permit (Permit Number C553-0192858-006-DWC/CG) authorizing the Facility's system to be put into service.

11.     Meanwhile, in significant reliance on the City's letter agreement with BDS's predecessor EAP (Exhibit "A"), BDS's predecessor EAP and BDS entered into a "Regional Facility Agreement" on October 21, 2011.

12.     Under the Regional Facility Agreement, BDS was obligated, in part, to:

a.   place the necessary equipment to process the material without cost to EAP;

b.   pay the engineering costs and DEP permitting costs associated with placing the "Bioset" equipment at the location;

c.   obtain the DEP permit;

d.   pay the laboratory fees associated with producing Class AA fertilizer product at the Facility;

e.   pay the costs of the chemicals and electricity to run the "Bioset" equipment;

f.   pay the wages and place a Class A certified operator in the Facility; and

g.   pay the costs of the equipment and labor to market and distribute the Class AA fertilizer product.

BDS was fully complaint with the Regional Facility Agreement.

13.     On or about January 31, 2012, BDS's predecessor EAP informed the City, including by email that it had "...partnered with Biosolids Company [i.e. BDS] and are in the process of permitting and installing a bioset which will turn the solids into a fertilizer."

### (2) BDS's Permitting

14.     On June 6, 2012, BDS submitted the Wastewater Permit Application for Domestic Wastewater Facilities to DEP for its biosolids treatment to produce the Highest Quality Class AA biosolids.

15.     The DEP's Notice of Intent to Issue the BDS permit was issued on January 10, 2013, and the City did not petition to challenge the issuance of the permit.

16.     On January 27, 2013, the improvements to install the upgraded and enhanced "Bioset" equipment were completed, and the DEP was properly notified.

17.     The DEP Domestic Wastewater Facility Permit (Permit Number FLA784893) was issued on February 5, 2013 to BDS to produce the Highest Quality Class AA product meeting both federal and state regulatory standards found at 40 CFR 503 and Rule 62-640, Florida Administrative Code.

### (3) BDS Purchases EAP

18.     On December 31, 2013, EAP, through the owners of the membership interests in EAP, entered into an Equity Purchase Agreement with BDS where BDS bought for $500,000 all of the outstanding membership interests of EAP.

19.     These interests of EAP purchased by BDS included "…all licenses, permits, and authorizations, necessary to carry on the business in which it (EAP) is engaged and to own and use the properties owned and used by (EAP)."

20.     The Equity Purchase Agreement includes the provision "[EAP] has owned its assets and operated its business in material compliance with all applicable laws, rules and regulations of all applicable Governmental Authorities." ("Governmental Authority" was contractually defined to include the City.)

21.    The owners of the EAP membership interest also executed a Consulting Agreement to continue providing general advice and business consulting services with BDS, which consulting will extend until December 31, 2016.

### (C) The City Commission's Abrupt and Unnecessary Action.

22.    Without prior notice or warning to BDS, on August 12, 2014, the City Manager sent a demand letter to DEP, copying the Florida Attorney General, the DEP Secretary, and the DEP Chief Deputy General Counsel (though not copying BDS).  The letter said:  "[R]ecently, we [the City] have become aware of a source of odor pollution…[and the City is] requesting the immediate assistance of the Florida Department of Environmental Protection…."  The letter threatened if the DEP "…fails to take action to abate this nuisance and violation of state law, the City will be forced to take all necessary steps, including seeking injunctive relief against the operator and filing a verified complaint [against the DEP.]"

23.    Also on August 12, 2014, the City held its regularly scheduled monthly commission meeting.  Even though the agenda for the City's regular meeting did not include any reference to BDS or its Facility, the City Commission, City Manager, and City Attorney discussed the BDS Facility and the odor event.   Members of the public testified; however, the City apparently made no effort to notify BDS it was a subject for discussion.  Upon information and belief, the City Manager or City Attorney, or both, stated on the record the BDS Facility was an unpermitted, illegal activity and odors from the Facility were irreparably harming the residents of the City.  Based on this discussion and with no input from BDS, the City Commissioners abruptly and unnecessarily directed the City Manager and City Attorney to initiate litigation for injunctive relief to shut down BDS.

24.     On August 18, 2014, in the first written correspondence to BDS (submitted through BDSs' counsel after BDS's counsel initiated contact with the City) concerning the odor event, the City Attorney incorrectly wrote: "[W]hat our citizens cannot tolerate is the continued operation of the *unpermitted* facility...." (emphasis supplied) Contrary to the City Attorney's statement, the BDS Facility is fully permitted by the DEP and in full compliance with its permit.

25.     On August 20, 2014, the City Attorney wrote to BDS's counsel: "...you failed to address or [sic] request that [BDS] cease operating the current, non-agricultural sludge dumping and processing operation until the odor ceases and ...odors will not leave your client's property." Indeed, odor control is maintained because the Bioset system is a completely closed engineered system. The Bioset reactor is a pressurized pipe completely containing all vapors. The High Quality Class AA product has no "odor" but smells similar to wet concrete. As stated in the DEP permit, BDS's Bioset process produces a High Quality Class AA product meeting both 40 CFR 503 and Rule 62-640, F.A.C., which product is an allowed use on "...unrestricted public access areas such as playgrounds, parks, golf courses, lawns, and hospital grounds."

26.     On August 26, 2014, the City Attorney astonishingly begins his letter with "[I]t has come to the attention of the City...that your facility is physically connected to the Fort Meade sewer system." Contrary to the City's stated surprise, since the July 1, 2011 letter agreement with BDS's predecessor EAP (Exhibit "A") the City was sending its wastewater residuals to the BDS Facility continually until the City breached that letter agreement and began sending its wastewater residuals to another processor on or about August 27, 2014, and correspondingly BDS has fully complied with the July 1, 2011 letter agreement by accepting the City's wastewater residuals without payment from the City in exchange for the connection to the City's sewer system. (Exhibit "A.")

8

27.     More specifically, pursuant to the July 1, 2011, letter agreement with the City, the City agreed to accept the filtrate from the Facility in the amount of 100,000 gallons per day and the Facility agreed to transport and treat 250,000 gallons of the City's wastewater residuals annually produced by the City's wastewater treatment operation, which agreement-by conservative estimate- has saved the City in excess of $200,000 per year in waste handling and transportation costs.

28.     Additionally and without any basis or foundation, the City Attorney in his August 26th letter accused BDS of improperly removing "...the meter which was previously in place between your facility and the City...sewer system."   In a breach of the July 1, 2011, letter agreement (Exhibit "A") and without any due process, the letter said: "...you are hereby notified that as of the date of this letter, the City...will not provide any biosolids to the Biosolid Distribution Services, LLC facilities operating under FDEP Permit Number FLA784893."

29.     A review of the City's new Residuals Hauling and Processing Agreement entered into on August 27, 2014, reveals the City will now pay $0.14 per gallon for the removal and processing of its wastewater residuals, which equates to approximately $280,000 per year.

30.     Also on August 26, 2014, there was a special meeting of the City Commission solely to discuss BDS.  Inexcusably and inconsistent with due process, the City failed to notify BDS or its legal counsel of the special meeting.  The City Commission, City Manager, and City Attorney again asserted BDS was unpermitted, improperly zoned, and illegally operating. The City also claimed BDS had unlawfully accessed the City's wastewater treatment system and had removed a City flow meter.

31.     Having learned independently of this special meeting, BDS's counsel attended and offered correcting facts:  the property is properly zoned in the City's Heavy Industry (M-2) land

use classification; BDS is operating consistent with the July 1, 2011 letter (Exhibit "A") with the City; BDS, similar to its predecessor EAP, is properly connected to the City's wastewater treatment system; BDS has all applicable permits and is operating in full compliance with all state and federal regulatory rules and regulations; and BDS did not remove the water meter. Nonetheless, the City threatened to terminate connection to the City's wastewater treatment system, which action would close down BDSs' operations, unless BDS succumbed to the City's demand to enter into a utility agreement by September 9, 2014.  (The City Attorney reluctantly admitted at the September 8th meeting with BDS that the City did not have a utility agreement with any other business or person within the City.)  BDS made a good faith offer to substantially reduce the Facility's activities  until resolution of the utility agreement issue, but this offer was immediately rejected by the City Commission and the Mayor, who confessed he would never sign such a utility agreement with BDS. The City Commission again directed the City Manager and City Attorney to obtain injunctive relief against BDS.

32.    In a continuing effort to open a dialogue and to reach an understanding with the City, BDS representatives requested a meeting with only the City Manager, but the City Attorney refused to stay away.  When the BDS representatives arrived on September 8, 2014, they learned the City had invited the media to attend the meeting.

33.    Before greetings were fully exchanged, the City Manager hand-delivered a demand letter to BDS, which stated in part:

> Despite the fact that you removed the wastewater meter, we have calculated your usage at approximately 100,000 gallons per day.  Your flows are also laden with higher concentration of industrial pollutants.   Thus, you may be subject to surcharges under the City's wastewater user ordinance.
> We are working to determine what, if any, surcharges may apply to you.  In the meantime, however, you owe the City $380,917.14 in wastewater impact fees payable immediately as a condition of continued service.  If you do not remit

payment by September 12, 2014, we will reluctantly be forced to terminate service to your property. Please govern yourself accordingly.

34.     BDS had identified and planned to present ideas and potential compromises at the September 8th meeting but these never reached the table; instead, BDS left the meeting with a list of unreasonable demands by the City, such as the demand to apply for and obtain rezoning approval even though the Facility's location is a permitted use by right in the Heavy Industry (M-2) land use classification and a demand to obtain a building permit for a building that is approximately fifty years old.

35.     The following day, September 9, 2014, the City Commission voted unanimously authorizing the City to sue both BDS and the DEP, without entertaining discussion or input from the several representatives of BDS, including its President (who had traveled from Minnesota), or representatives of DEP also in attendance, to offer any information, education, or defenses before the City Commission vote, which vote was without due process, arbitrary, and capricious.

### (D) THE DEP's ODOR EVENT INVESTIGATION AND FINDINGS

36.     The first odor complaint to DEP was not until March 10, 2014, and this was the only complaint that month. The DEP made a site visit and found no odor.

37.     According to City records, a total of 4 individuals on 7 occasions between March 11, 2014, and July 1, 2014, lodged complaints with the City concerning odors. The DEP received a few odor complaints in June 2014.

38.     Due to these complaints, the DEP performed a compliance inspection on July 14, 2014. The DEP reported no "objectionable odors" and "… the [F]acility and storage site were determined to be in compliance" in all areas: permit; compliance scheduling; sampling; records

and reports; facility site review; operation & maintenance; staging site review; and odor/nuisance/vectors.

39.     Subsequently, the DEP received a list containing odor complaints from 7 individuals, which included some of the same people from earlier complaints on 6 different days in July 2014 from the City. The DEP conducted a second site inspection on August 1, 2014.

40.     During the second site inspection, the DEP found an odor. The finding did not rise to the level of an enforcement action, rather the DEP submitted a Compliance Assistance Offer to BDS on August 6, 2014.

41.     The DEP informed the City it has received BDS's timely response to the Compliance Assistance Offer, and the DEP informed interested parties it "will continue to work with the facility in hopes of resolving this issue."

42.     A Polk County Commissioner complained about "the improper disposal of sewage on-site" at the Facility in a phone call to the DEP on August 20, 2014. In response the DEP arranged for the Florida Department of Health in Polk County ("DOH") to inspect the Facility.

43.     The DOH conducted a site inspection on August 20, 2014. The DOH reported to DEP that in "[C]omparing the Facility to DOH regulated types, BDS showed no violations. The AA material stockpile area….had some odor, and that of ammonia, but nothing offensive. Some flies present, but not excessive." (Emphasis added).

44.     Over the course of these investigations, the DEP was meeting and communicating frequently with BDS representatives, and offered praise for the aggressive actions and full cooperation of BDS in good faith response to the complaints.

45.     To this day, no level of enforcement action by any state or federal regulatory agency is underway against BDS.

## (E) BDS's ACTIONS IN RESPONSE TO ODOR EVENT

46.     First, the odor event did not arise from the BDS processing operations rather the odor originated from the wastewater residuals source materials from the City and other providers deliveries for processing by BDS; however, BDS is committed to best management practices in its receiving protocols to help control odor.

47.     In timely response to the DEP Compliance Assistance Offer, on August 11, 2014, BDS reported the following voluntary action items in response to the odor event: significant reduction (approximately 60% cake sludge and 30% liquid sludge) in the amount of incoming wastewater residuals; installation of two temporary air scrubbers; installation of five additional deodorizing mist/spray devices; hiring additional employees to facilitate more efficient operations; operational changes, such as delivery of sludge material to doors further away from the road, closing delivery doors, and coordinated with providers regarding delivery logistics; and planting 100 eucalyptus trees.  BDS always followed the guidance of DEP during this period.

48.     Results of sampling of the incoming source wastewater materials are expected on or about September 18, 2014, which sampling was voluntarily performed by BDS for analysis and evaluation of the possibility and feasibility of engineering controls for the receiving stage of operations.

49.     BDS reached out to the City before the City ever communicated its concerns to BDS. On August 15, 2014, BDS sent a letter to the City Attorney informing him BDS is in "…communication with the [DEP] and will be working with the [DEP] for purposes of resolving outstanding issues and doing so in a timely manner."  The letter also communicated an offer to have BDS discuss with the City the recommendations received from BDS's consultants, which offer the City never accepted.

50.     On August 19, 2014, BDS participated in a call with numerous DEP representatives to continue dialogue related to addressing the odor event, which call was followed by a memorandum summarizing the actions and timing of BDS's voluntary actions, including BDS commencing an evaluation of the feasibility and performance of a $500,000 receiving station as a possible system enhancement.

51.     Conference calls were held with DEP on August 25th, September 4th, and 8th as BDS continued to fully cooperate with the DEP.

52.     Concurrently, BDS attempts to have meaningful discussions with the City were extraordinarily unsuccessful, as described summarily in this pleading.   Throughout, the City's obstinate position remained unaltered; "...cease and desist all domestic sludge (either digested or undigested) operations immediately...."

53.     BDS's multiple voluntary actions were designed to address this atypical odor event due to variables of the source wastewater materials received from various municipalities and businesses in the region.   BDS has honored its pledge:   " [W]e as a company take our responsibility to the community, industry, and the State of Florida very seriously and will work alongside the department to make sure we are in full compliance."

54.     During this odor event investigation, BDS remained in full compliance with all applicable state and federal regulatory rules and regulations and its permit.

**(F) ADVERSE IMPACTS ON BDS DUE TO CITY'S FINAL DECISION**

55.     The City's decision to seek immediate injunctive relief against BDS jeopardizes the employment for 15 of BDS's local residents and as many as 10 employees in BDS affiliated operations.

56.     BDS has business relationships and contracts with the following government entities and businesses, all of which are currently, or will be,  substantially and adversely affected by the City's decision:

| | |
|---|---|
| (a) | City of Fort Lauderdale |
| (b) | Miami-Dade County |
| (c) | City of Marathon |
| (d) | City of Sebring |
| (e) | Palm BeachCommissioners |
| (f) | City of Orlando |
| (g) | Arthur Price |
| (h) | City of Winter Springs |
| (i) | State of Florida Dept. of Corrections |
| (j) | Denali Water Solutions |
| (k) | Bingham On Site Sewer Inc. |
| (l) | Total Enviro Services |
| (m) | SOS Septic Inc. |
| (n) | City of Wauchula |
| (o) | Hardee County Utilities |
| (p) | Economy Septic Inc. |
| (q) | A-1 Quality Service Inc. |
| (r) | Averett Septic Tank Company Inc. |
| (s) | Binghams Septic |
| (t) | Brooker Septic Services Inc. |
| (u) | Brownies Septic and Plumbing Service |
| (v) | Chancy Bohannon Septic |
| (w) | City of Bowling Green Utilities |
| (x) | Handy-Can Portable Restrooms |
| (y) | Liberty Plumbing and Septic Services |
| (z) | Little Charlie Creek RV Park |
| (aa) | Spiker Septic Services |
| (bb) | Stidhams Rentals Inc. |
| (cc) | Total Septic |
| (dd) | Sweetwater Environmental |

57.     As a consequence of BDSs' voluntary reduction in source materials from the above suppliers BDS monthly revenues are down approximately $100,000.

58.     BDS's voluntary enhancements to the Facility have increased operating costs from approximately $32 per ton to $47 per ton.

59.     BDS uses this Facility as a "Class A Regional Bioset Facility" showcase to demonstrate and market the highly engineered technologies in use at the Fort Meade location to interested government officials and private businesses. Not only is the over one million dollar investment in Facility enhancements at the Fort Meade Facility at risk, but the reckless and unjustified position of the City has caused unknown damage to existing contractual and potentially advantageous business relationships across Florida and the United States.

### (G) THE UNIQUE BDS TREATMENT PROCESS

60.     The U.S. Environmental Protection Agency ("USEPA") has established federal requirements for the safe, beneficial reuse, and disposal of biosolids.

61.     The BDS Facility in Fort Meade is a USEPA Class A biosolids facility with equipment engineered and installed by SCHWING BIOSET, INC., and operated, maintained, and marketed by BDS.

62.     Class A biosolids, as produced at the Fort Meade Facility, pose little to no risk to public health and because of the extremely low pathogen concentrations have few or no use restrictions for use as a fertilizer supplement or soil amendment in full compliance with the 40 CFR Part 503.

63.     On August 16, 2011, the EPA designated the BDS Bioset process as a USEPA National PFRP ("process to further reduce pathogens ") Equivalency in accordance with 40 CFR 503.32(a)(8).

64.     The BDS Bioset technology is used in applications across the country, including Kingwood TX; Columbus NE; Morgan City LA; Mazomanie WI; Stewartstown PA; Elgin SC; Ellsworth,WI; Cloquet MN; Upstate New York; and Hollywood FL.

65.     BDS saw an opportunity and started the Fort Meade operations due to Florida's revised wastewater residuals regulations found at Chapter 62-640, F.A.C., affecting and limiting the disposal options for municipalities to dispose of their biosolids.

66.     Significant to this dispute with the City, the BDS Bioset process is odor free. This process is totally enclosed within the reactor resulting in an odor free process. The reactor gases are collected and scrubbed resulting in a final product that has an odor similar to wet concrete.

### (H) MISCELLANEOUS

67.     BDS seeks to recover its reasonable damages, including but not limited to, the cost of impacts to contractual and advantageous business relationships exceeding $696,500, the cost of its capital investment in the Facility in excess of $500,000, and the cost of hauling and treating the City's wastewater residuals amounting to $688,100, and other expenses, and costs of this dispute, including attorneys' fees.

68.     BDS was required to retain legal counsel and to pay reasonable attorneys' fee and costs to pursue this action, and as prevailing party may be entitled to recover its attorneys' fees under Florida law.

69.     All conditions precedents to the filing of this action were performed, occurred, or were waived, including any notice requirements of Section 768.28, *Florida Statutes* (2013); however, if applicable, any attempts at notice would be futile given the City's repeated failure to perform its contractual and governmental obligations or pursue a good faith resolution to this dispute.

## COUNT I—TEMPORARY INJUNCTION

70.     Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1 through 69 above as if fully set forth below.

71.     This is an action for temporary injunction against the City.  To the extent this relief is inconsistent with the relief pled in subsequent counts, this is pled in the alternative.

72.     Absent entry of an injunction by this Court, the City will cause serious irreparable injury and damages to BDS by its actions.

73.     Plaintiff has no adequate remedy at law.

74.     Plaintiff has a substantial likelihood of success on the merits.

75.     The injury to Plaintiff due to the City's actions far outweighs any possible harm an injunction may cause the City, and the public interest is served by requiring the City to comply with its obligations.

76.     An injunction will not disserve the Public interest; indeed, the overall public interest is served by the beneficial reuse of biosolids and innovative and alternative uses for biosolids offered by the Plaintiffs process over its competitors.

## COUNT II—TORTIOUS INTERFERENCE WITH ADVANTAGEOUS AND CONTRACTUAL BUSINESS RELATIONSHIPS

77.     Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1 through 69 above as if fully set forth below.

78.     Plaintiff enjoys the existence of multiple business relationships and contractual relationships under which Plaintiff has legal rights, including contractual rights.

79.     The City knows of the Plaintiffs' business and contractual relationships, yet without justification or privilege intentionally and unjustifiably interfered with these advantageous business and contractual relationships.

80.     Plaintiff has suffered damages as a result of the City's interference with these advantageous business and contractual relationships.


## COUNT III—EQUITABLE ESTOPPEL

81.     Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1 through 69 above as if fully set forth below.

82.     The City approved the business operations of Plaintiff and its predecessor EAP. The City represented certain material facts, which are contrary to the City's later-asserted positions.

83.     Plaintiff reasonably relied on the City's representations to its substantial detriment. The City should not be permitted to use its position as a municipality to the unfair disadvantage of its citizens.

84.     As a result of the City's initial representations and later-asserted and contrary representations, Plaintiff is damaged by the change in position and its reliance thereon.


## COUNT IV – BREACH OF IMPIED-IN-FACT CONTRACT

85.     Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1 through 69 above as if fully set forth below.

86.     This is an action for breach of implied-in-fact contract against the City.

87.     The City asserted and entered into the contract with Plaintiff's predecessor EAP as more specifically described above.  Some of the terms of the contract are contained from the

course of dealing and usage of performance between the parties.  (A true and correct copy of the contract is attached hereto as Exhibit "A".)

88.  The City breached the terms of the contract.

89.  As a result of the City's breach of the terms and conditions of the contract, Plaintiff has and will continue to suffer damages.

## COUNT V – VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

90.  The Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 69 above as fully set forth below.

91.  This is an action under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), which renders unlawful unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce at Section 501.204, *Florida Statutes.* (2013)

92.  At all relevant times, the City was engaged in trade or commerce as defined in Section 501.203, *Florida Statutes* (2013).

93.  At all relevant times, Plaintiff was a "consumer" as defined by Section 501.203, *Florida Statutes* (2013).

94.  The City's actions as described herein are unfair, unconscionable, and deceptive pursuant to Section 501.204, *Florida Statutes* (2013), and constitutes a violation of FDUTPA.

95.  As a result of the City's unfair, unconscionable, and deceptive practices, Plaintiff was caused actual damages.

96.     Based on information and belief, the acts and business practices of the City complained of in this Complaint were committed willfully and with full knowledge of Plaintiffs' contractual rights.

97.     Plaintiff was required to obtain the undersigned and pay attorneys' fees and incur costs of litigation, and are entitled to recover the attorneys' fees and costs in bringing this lawsuit as provided by Section 501.2105, *Florida Statutes* (2013).

## COUNT VI – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

98.     Plaintiff hereby re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 69 above as fully set forth herein.

99.     This is an action for breach of the implied covenant of good faith and fair dealing against the City concerning the contract.  (A true and correct copy of the contract is attached hereto as Exhibit "A.")

100.    Under Florida law, the implied covenant of good faith and fair dealing is a part of the contract.

101.    The City knew prior to entering into the contract its express obligations to Plaintiff predecessor EAP and, correspondingly to Plaintiff, and have breached the express terms of the contract.

102.    The City by conscious and deliberate act, failed and continues to refuse to discharge its contractual responsibilities, which has unfairly frustrated the contract's purpose and disappointed the contractual expectations of Plaintiff.

103.    The City's breach has deprived Plaintiff of the contract's benefits and Plaintiff has suffered damages as a result.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

1.    A Temporary Injunction as authorized by law, including Section 501.207, *Florida Statutes* (2013).

2.    A judgment against the City awarding Plaintiff all damages, including past and future damages.

3.    A finding that awarding of Plaintiffs' attorneys' fees and costs is in the public interest pursuant to Section 501.2105, *Florida Statutes* (2013), and awarding Plaintiffs all reasonable attorneys' fees, and appropriate costs in pursuing this action.

4.    Such other and further relief as the Court finds appropriate.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES TRIABLE AS OF RIGHT BY JURY.**

## **VERIFICATION**

I hereby certify under penalty of perjury that I have read the foregoing and the facts stated herein are true.

_____
Tom Anderson, President,
Biosolids Distribution Services, LLC,

DATED this _____ day of September 2014.

## VERIFICATION

I hereby certify under penalty of perjury that I have read the foregoing and the facts stated

herein are true.

Tom Anderson, President,
Biosolids Distribution Services, LLC,

DATED this __15__ day of September 2014.

23

Respectfully submitted,

RYAN LAW, P.A.


s/ Rory C. Ryan
Rory C. Ryan, Esq.
Florida Bar Number 862010
870 Clark Street, Suite 1000
Oviedo, FL  32765
Tel:  (407) 359-0403
Fax: (407) 359-0416
rryan@ryan-law.com
awood@ryan-law.com
LEAD TRIAL COUNSEL FOR PLAINTIFF

and

PETERSON & MYERS, P.A.

s/ Jack P. Brandon
Jack P. Brandon, Esq.
Florida Bar Number 0117641
100 West Stuart Avenue
Lake Wales, Florida 33853-4030
Tel:  (863) 676-7611
Fax:  (863) 676-0643
ballen@petersonmyers.com
jbrandon@petersonmyers.com
TRIAL COUNSEL FOR PLAINTIFF



**City of Fort Meade**

6 West Broadway Avenue • P.O. Box 859
Fort Meade, Florida 33841-0856
863.285.1100 • 863.285.1124
www.cityoffortmeade.com

July 1, 2011

Mr. Steve Lanier
1491 NW 14th Street
Post Office Box 4
Fort Meade, Florida 33841

RE: Environmental AG Products
    Fort Meade Project

Dear Mr. Lanier:

The Fort Meade City Commission reviewed the proposal you presented on behalf of Environmental AG Products during the June 12, 2011 Meeting. The location on which this operation will be sighted has a Land Use Classification of M-2 and this use is a permitted use by right.

The City Commission fully supports the development and recognizes the long term benefits to the region as well as the City of Fort Meade this project will provide. The Commission has entered into an arrangement with Agreement with Environmental AG Products to allow for the incremental disposal of the wastewater 100,000 gpd produced by this operation into the Cities wastewater collection and treatment system. Environmental AG Products will transport and process 250,000 gallons of sludge produced by the City of Fort Meade's wastewater treatment operation annually in exchange for this service. This project has received the approval of the Domestic Wastewater Program Office of the Florida Department of Environmental Protection, Temple Terrace Office. To date required testing and monitoring preformed at the Fort Meade Wastewater Treatment Plant has not demonstrated nor exceeded the systems operational limits as a result of Environmental AG Products operation.

On behalf of the Fort Meade City Commission, we look forward to answering any questions or concerns you or your staff may have regarding Environmental AG Products project and operation.

Sincerely,

Fred Hilliard
City Manager